ACCEPTED
03-15-00728-CV
12689127
THIRD COURT OF APPEALS
AUSTIN, TEXAS
9/14/2016 10:12:33 AM
JEFFREY D. KYLE
CLERK

NO. 03-15-00728-CV

IN THE THIRD COURT OF APPEALS
AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS

9/14/2016 10:12:33 AM

JEFFREY D. KYLE
Clerk

Westlake Ethylene Pipeline Corporation,

*Appellant,*

v.

Railroad Commission of Texas and

Eastman Chemical Company,

*Appellees.*

On Appeal from the
398th Judicial District Court of Travis County, Texas

## WESTLAKE ETHYLENE PIPELINE CORPORATION'S
## ORAL ARGUMENT EXHIBITS

Lindsay Hagans
State Bar No. 24087651
lindsay.hagans@bracewelllaw.com
BRACEWELL LLP
711 Louisiana Street, Suite 2300
Houston, Texas 77002
Telephone:  (713) 223-2300
Facsimile:   (800) 404-3970

Dale Wainwright
State Bar No. 00000049
dale.wainwright@bracewelllaw.com
BRACEWELL LLP
111 Congress Avenue, Suite 2300
Austin, Texas 78701
Telephone:  (512) 472-7800
Facsimile:   (800) 404-3970

ATTORNEYS FOR APPELLANT WESTLAKE ETHYLENE PIPELINE CORPORATION

# CERTIFICATE OF SERVICE

I certify that a copy of Appellant's Oral Argument Exhibits for the September 14, 2016 Oral Argument was served on counsel of record by using the Court's CM/ECF system on the 14th day of September 2016, addressed as follows:

Prerak Shah
prerak.shah@texasattorneygeneral.gov
Daniel Wiseman
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711
Tel.: (512) 936-2923
Fax: (512) 474-2697

*Attorneys for the Railroad Commission of Texas*

James Mann
Marnie McCormick
mmccormick@dwmrlaw.com
Leslie Padilla
DUGGINS WREN MANN & ROMERO, LLP
600 Congress, Suite 1900
Austin, Texas 78701
Tel.: (512) 744-9300
Fax: (512) 744-9399

Wallace B. Jefferson
wjefferson@adjtlaw.com
J. Woodfin Jones
Dana Livingston
ALEXANDER DUBOSE JEFFERSON &
    TOWNSEND LLP
515 Congress Avenue, Suite 2350
Austin, Texas 78701
Tel.: (512) 482-9300
Fax: (512) 482-9303

*Attorneys for Eastman Chemical Company*

/s/ *Dale Wainwright*
Dale Wainwright

# INDEX

Railroad Commission's Final Order                                    Exhibit A

Key Rulings In Railroad Commission's Final Order                     Exhibit B

Eastman's Case Is Built On Speculation                               Exhibit C

No Evidence To Support Claims Of Discrimination Or Stranded          Exhibit D
Ethylene

Amici Letters In Support Of Westlake Pipeline                        Exhibit E

    1. Howard Energy Partners

    2. The Williams Companies

    3. Kinder Morgan Energy Partners, L.P.

    4. Enlink Midstream Operating, LP and Howard Midstream Energy Partners, LLC

    5. Seminole Pipeline Company

# Ex. A

**BEFORE THE**
**RAILROAD COMMISSION OF TEXAS**

| | |
|---|---|
| COMPLAINT FILED BY EASTMAN § | |
| CHEMICAL COMPANY AGAINST § | |
| WESTLAKE ETHYLENE CORP., § | **GAS UTILITIES DOCKET NO. 10296** |
| (WESTLAKE PIPELINE) REGARDING § | |
| WESTLAKE PIPELINE'S SYSTEM T-4 § | |
| PERMIT NO. 05253 § | |

**FINAL ORDER**

Notice of Open Meeting to consider this Order was duly posted with the Secretary of State within the time period provided by law pursuant to TEX. GOV'T CODE ANN. Chapter 551, *et seq.* (Vernon 2008 & Supp. 2014). The Railroad Commission of Texas adopts the following findings of fact and conclusions of law and orders as follows:

**FINDINGS OF FACT**

1. Westlake Ethylene Pipeline Corporation (Westlake Pipeline) operates a pipeline pursuant to T-4 Permit No. 05253.

2. The pipeline that is subject to T-4 Permit No. 05253 runs from Mont Belvieu, Texas to Longview, Texas and traverses seven counties: Chambers, Liberty, Polk, Angelina, Nacogdoches, Rusk and Gregg, Counties.

3. The pipeline is currently operated by Buckeye Development & Logistics I LLC (Buckeye) on behalf of Westlake Pipeline.

4. On July 29, 2013, Eastman Chemical Company (Eastman) filed a complaint against Westlake Ethylene Pipeline Corporation (Westlake Pipeline) alleging that a tariff published and filed by Westlake Pipeline in 2013 (*2013 Westlake Pipeline Tariff*) was discriminatory.

5. A notice of hearing on jurisdictional issues was issued on September 13, 2013, and a hearing on jurisdictional issues was held on September 27, 2013.

6. A notice of hearing on the merits was issued on March 24, 2014. The notice of hearing bifurcated the hearing in this matter into two phases. Phase 1 addressed all discrimination and non-rate issues. All rate issues have been severed into Phase II.

7. Phase II was severed into a separate proceedings docketed as GUD No. 10358, *Rate-Setting Proceeding Regarding Westlake Pipeline Severed from GUD No. 10296.*

8. On May 2, 2014, Westlake Pipeline filed an affidavit attesting that notice was served on the entity that operates the pipeline on behalf of Buckeye and all current customers of the pipeline that is the subject of this proceeding.

9. The hearing on Phase I, GUD No. 10296, was held on May 6, 2014.

10. Westlake Pipeline is subsidiary of Westlake Chemical Corporation (Westlake Chemical). Another Westlake Chemical subsidiary, Westlake Longview Corporation (Westlake Longview) is located in Longview.

11. The facilities of Westlake Longview are connected to ethylene supplies at Mt. Belvieu through Eastman's ethylene distribution system at Longview and the Westlake Ethylene Pipeline.

12. Westlake Longview consumes large quantities of ethylene in Longview.

13. Westlake Longview, or its ethylene supplier, is a shipper on the pipeline operated by Westlake Pipeline.

14. Eastman owns and operates ethylene producing facilities in Longview.

15. Eastman's Longview facility converts natural gas liquids (NGLs) feedstock, such as ethane and propane, to ethylene and propylene.

16. Eastman currently produces about 1,400 million pounds of ethylene annually from its crackers at Longview.

17. Eastman uses about 600 million pounds of ethylene annually at Longview, leaving about 800 million pounds of ethylene that must either be sold in Longview or transported to, or exchanged at, Mont Belvieu each year.

18. Other than Eastman's own use, the only substantial market for ethylene in Longview is Westlake Longview.

19. Eastman is a shipper on the pipeline operated by Westlake Pipeline.

20. In 1995, Eastman began planning a "common carrier" pipeline to provide ethylene to its Longview plant and construction began in December 1996.

21. Mustang Pipeline Company (Mustang), an Eastman subsidiary, started construction on the pipeline.

22. In 2002, Eastman constructed the "Williams Connection."

23. The Williams Connection connected Eastman's Mont Belvieu terminal to contracted storage owned by the Williams Company, the first fungible ethylene storage facility in

Mont Belvieu, and added the compression necessary to ship ethylene south to Mont Belvieu.

24. At the time of the construction of the Williams Connection, Eastman sought the ability to sell surplus ethylene produced in Longview and allow Eastman to maintain ethylene production when ethylene-consuming facilities were down in Longview.

25. In 1997, Mustang Pipeline issued the original tariff for the pipeline (*1997 Mustang Tariff*).

26. The *1997 Mustang Tariff* identified the "origin point" as Mont Belvieu and the "delivery point" as Longview.

27. The *1997 Mustang Tariff* did not include provisions for the exchange of ethylene.

28. In 2002, after adding compression necessary to deliver ethylene from Longview to Mont Belvieu, Mustang Pipeline issued a revised tariff (*2002 Mustang Tariff*).

29. The *2002 Mustang Tariff* identified Mont Belvieu as both an origin and delivery point.

30. The *2002 Mustang Tariff* identified Longview as both an origin and delivery point.

31. The *2002 Mustang Tariff* also indicated that Mustang, the operator of the pipeline, would, in addition to physical deliveries of ethylene, offer exchange services.

32. On November 10, 2006, Eastman and Westlake Chemical entered into an acquisition agreement.

33. As part of the sales agreement the Mustang pipeline assets were transferred to Westlake Pipeline.

34. As part of the acquisition agreement certain ethylene-consuming facilities owned by Eastman were sold to Westlake Longview.

35. The purchase agreement between Mustang Pipeline and Westlake Pipeline included the sale of the pipeline conduit.

36. Westlake Pipeline's ownership of the pipeline at the southern end begins just outside the two meters belonging to Equistar and Williams and a check meter and pipeline belonging to Eastman. The pipeline extends from that ownership point at Mont Belvieu to a point that connects the Eastman plant to distribution facilities in Longview. The pipelines' connection at Longview is on property that is owned by Eastman.

37. The pipeline purchase agreement also included all right of ways, easements, privileges and grants upon and under which the pipeline system was laid and installed.

38.　Westlake Pipeline did not acquire any terminals in the sale, the pipeline terminals, nor any of the compression necessary to operate the pipeline.

39.　The overall sales agreement between Eastman and Westlake Chemical included the acquisition, by Westlake Longview, of three polyethylene units that are located within the Eastman's plant in Longview.

40.　As part of the overall sale, on November 10, 2006, Eastman Chemical and Westlake Chemical Corporation entered into the Ethylene Sales and Exchanges Contract (ESA).

41.　The ESA is a ninety-nine year ethylene contract that sets a market price using a pre-determined formula agreed to by both parties in the contract.

42.　Pursuant to the ESA, Eastman Chemical secured a guaranteed market for ethylene, and Westlake Longview Corporation secured an ethylene supplier.

43.　The ESA also provided Eastman with the ability to exchange any excess ethylene that Westlake Longview did not purchase from Eastman.

44.　In 2013, Westlake Pipeline published and filed a new tariff for the pipeline (*2013 Westlake Tariff*).

45.　Pursuant to the *2013 Westlake Pipeline Tariff*, Mont Belvieu was no longer designated as both an origin and delivery point. Mont Belvieu was designated as an origin point.

46.　Pursuant to the *2013 Westlake Pipeline Tariff*, Longview was no longer designated as both an origin and delivery point. Longview was designated as a delivery point.

47.　The *2013 Westlake Pipeline Tariff* removed all references to ethylene exchange as Westlake Pipeline determined that exchange services would no longer be offered.

48.　Mont Belvieu is the largest market for ethylene producers in the United States.

49.　Pipeline transport is among the most important factors that determine regional prices, supply, and demand.

50.　It is reasonable to conclude that the ethylene producers in Longview would require access to the ethylene market in Mont Belvieu.

51.　It is reasonable to conclude that ethylene consumers that engage in transactions in Mont Belvieu would desire access to ethylene produced in Longview

52.　Eastman produces large quantities of ethylene in Longview and has a physical necessity to move ethylene to Mont Belvieu.

53.   Ethylene was transported from Longview to Mont Belvieu on several occasions in the following years: 2005, 2006, 2007, 2008, and 2013.

54.   The necessity for southbound flow predates the purchase of the system by Westlake Pipeline. It is the reason that compression was added in 2002 to allow backhaul and to permit Eastman to sell surplus ethylene that it produced in Longview to customers on the Gulf Coast.

55.   Eastman has demonstrated a demand for exchanges as Eastman has engaged in exchanges with Westlake Pipeline's affiliate, Westlake Longview since entering into the ESA.

56.   Backhaul service is physically possible on the pipeline operated by Westlake Pipeline.

57.   The pipeline system was configured in 2002 to accept bidirectional flow.

58.   Backhaul on the pipeline occurred in 2005, 2006, 2007, 2008, and 2013.

59.   The *2013 Westlake Pipeline Tariff* removed the backhaul service previously offered in the *2002 Mustang Tariff*.

60.   The record in this case does not provide evidence of the impediment to the continued provisions of backhaul service.

61.   Any concern that this operator lacks the compression necessary to provide backhaul service is addressed by the language in the preexisting *2002 Mustang Tariff*, which requires shippers to deliver and receive product at the necessary pressures.

62.   Additional language may be added to further protect the common carrier;

> The paragraph means that a shipper is responsible for providing or arranging sufficient compression or services to effectuate the entry of the product into the pipeline at an Origin Point and delivery of the product out of the Pipeline at a Delivery Point.

63.   There is no impediment for a pipeline to provide exchange service and the risks associated with that service may be mitigated by appropriate language in the tariff.

64.   The *2002 Mustang Tariff* contained language that protected the pipeline operator and is included in the *2013 Westlake Pipeline Tariff*. Additional language may be added to protect the operator as follows:

> Carrier is not obligated to transport or exchange any volumes of ethylene unless Shipper delivers those volumes to the common stream out of which deliveries are made to Pipeline Customers.

65. Due to the unique circumstances of the ethylene market in Longview, without an exchange provision in the applicable pipeline tariff the only alternative for Eastman is to engage in exchanges with Westlake Longview, the pipeline operator's affiliate.

66. If exchange service is included in the applicable pipeline tariff Eastman may engage in exchanges with market participates in Mont Belvieu and will no longer be a captive to Westlake Longview.

67. Eastman, Westlake Longview, and Westlake Longview's ethylene suppliers (other than Eastman), are potential shippers on the pipeline operated by Westlake Pipeline.

68. Eastman and Westlake Longview are located in Longview.

69. Eastman and Westlake Longview each require movement of ethylene between Mont Belvieu and Longview.

70. Eastman and Westlake Longview require access to the ethylene market in Mont Belvieu and the ethylene market in Longview.

71. The only difference is that Eastman requires deliveries from Longview to Mont Belvieu and Westlake Longview requires deliveries from Mont Belvieu to Longview.

72. Eastman and Westlake Longview, or its other potential suppliers of ethylene, are similarly-situated shippers.

73. The tariff changes in the *2013 Westlake Pipeline Tariff* related to backhaul eliminated a service that was previously provided to Eastman on this pipeline.

74. The tariff changes in the *2013 Westlake Pipeline Tariff* related to backhaul physically shut Eastman out of the pipeline.

75. Longview is no longer designated as an "Origin Point" and Mont Belvieu is no longer designated as a "Delivery Point."

76. Due to the operation of the filed tariff Eastman would no longer be able to demand backhaul service

77. Due to the operation of the filed tariff, Westlake Pipeline would be unable to treat those points as Origin and Delivery points.

78. Westlake Longview will continue to have access to the pipeline and the Mont Belvieu ethylene market.

79. Eastman would be shut out of the Mont Belvieu market by the changes in the *2013 Westlake Pipeline Tariff*.

80. Westlake Pipeline has offered no reasonable basis for the disparate treatment as regards to physical deliveries on the pipeline.

81. The tariff change in the *2013 Westlake Pipeline Tariff* related to exchanges eliminates a pre-existing service offered by the pipeline operator.

82. Once that service is eliminated, Eastman must engage in exchanges with Westlake Longview, an affiliate of the pipeline operator.

83. The removal of exchange service further limits Eastman's access to the Mont Belvieu market through the pipeline.

84. The elimination of backhaul and exchanges, pre-existing service offered by the common carriers of this pipeline, provides an unreasonable preference in favor of Westlake Longview.

85. Whether discrimination by a common carrier exists depends on the facts of a particular case. The discriminatory act found to have occurred in this docket is the cancellation of pre-existing backhaul and exchange services so that one shipper, Eastman Chemical, is forced to sell or exchange the ethylene it produces to the only other shipper on the pipeline, Westlake Longview, the parent company of the pipeline.

## CONCLUSIONS OF LAW

1. Westlake Pipeline is a "common carrier" as that term is defined under TEX. NAT. RES. CODE ANN. § 111.020(d) (Vernon 2001 & Supp. 2014) and is therefore subject to the jurisdiction of the Railroad Commission of Texas (Commission).

2. As a common carrier Westlake Pipeline is subject to all provisions of the Common Carrier Act, TEX. NAT. RES. CODE ANN. §§ 111.002, 111.003, 111.011 – 111.025, 111.131, 111.133 – 111.142, 111.181 – 111.190, 111.221 – 111.227, & 111.261 – 111.262.

3. In addition to the powers provided by other sections of Chapter 2, Subchapter B of the Business Organization Act, TEX. BUSINESS CORP. ACT ANN. § 2.105 provides that a corporation, such as Westlake Pipeline engaged as a common carrier in the pipeline business for the purpose of transporting oil products has all of the rights and powers conferred on a common carrier by Sections 111.019 – 111.022.

4. The Commission has jurisdiction over Westlake Pipeline, associated affiliates, and the matters at issue in this proceeding pursuant to *TEX. NAT. RES. CODE ANN.* §§ 81.051 and §§ 111.002, 111.003, 111.011 – 111.025, 111.131, 111.133 – 111.142, 111.181 – 111.190, 111.221 – 111.227, & 111.261 – 111.262.

5. As required by *TEX. NAT. RES. CODE ANN.* § 111.014 Westlake Pipeline shall make and publish their tariffs.

6. A common carrier's obligations to its customers cannot exceed its duties under a published tariff and published tariffs govern the relationship of the common carrier with its customers. Common carriers may not vary a tariff's terms with individual customers, discriminate in providing services, or charge rates other than those included in properly published tariffs. The published tariffs and the constraints related to those tariffs provide predictability and certainty for all potential shippers and enable shippers to make decisions based upon the rates and services reflected in the published tariff. *CenterPoint Energy Entex v. R.R. Commn'n of Tex*, 208 S.W. 3rd 608 (Tex. – Austin 2006, pet. dism'd)

7. Westlake Pipeline, as a common carrier, is required to receive and transport ethylene delivered to it for transportation and perform its other related duties without discrimination as required by TEX. NAT. RES. CODE ANN. § 111.015.

8. Westlake Pipeline, as a common carrier, shall not discriminate between or against shippers with regard to facilities furnished, services rendered, or rates charged under the same or similar circumstance in the transportation of ethylene as required by TEX. NAT. RES. CODE ANN. § 111.015.

9. Westlake Pipeline, as a common carrier, may not charge, demand, collect, or receive either directly or indirectly from anyone a greater or lesser compensation for a service rendered than from another for a like and contemporaneous service.

10. Westlake Pipeline's 2013 tariff terminated pre-existing backhaul and exchange services and provided an unreasonable preference and advantage to its affiliate, Westlake Longview.

11. The Commission has the authority to require that tariffs published by a common carrier and filed with the Commission are not discriminatory.

12. Tariffs that provide disparate treatment to similarly-situated shippers or provide an unreasonable preference or advantage to an affiliate at the expense of other shippers are discriminatory.

13. There is no general duty for a common carrier to provide backhaul and exchange services. Neither is there a general duty to maintain services previously offered by a common carrier. It is discriminatory, however, for a common carrier to cancel previously existing services and cut off access to a market so that all other shippers on the pipeline are forced to sell or exchange their product with a shipper on that same pipeline which is affiliated with the pipeline.

**IT IS THEREFORE ORDERED** that the *2013 Westlake Pipeline Tariff* is rejected and may not be enforced by Westlake Pipeline.

**IT IS FURTHER ORDERED** that Westlake Pipeline publish and file with the Commission a revised tariff that is not discriminatory and conforms to the tariff attached to this Final Order as Exhibit A.

**IT IS FURTHER ORDERED** that, in accordance with TEX. NAT. RESOURCE CODE ANN. § 111.015, within 30 days of the date this Order is signed, Westlake Pipeline shall file the approved tariff with the Director of the Oil and Gas Division. The tariffs shall reflect the findings of fact and conclusions of law herein.

**IT IS FURTHER ORDERED** that all proposed findings of fact and conclusions of law not specifically adopted in this Order are hereby **DENIED**.

**IT IS ALSO ORDERED** that all pending motions and requests for relief not previously granted or granted herein are hereby **DENIED**.

This Order will not be final and effective until 20 days after a party is notified of the Commission's order. A party is presumed to have been notified of the Commission's order three days after the date on which the notice is actually mailed. If a timely motion for rehearing is filed by any party at interest, this order shall not become final and effective until such motion is overruled, or if such motion is granted, this order shall be subject to further action by the Commission. Pursuant to TEX. GOV'T CODE ANN. § 2001.146(e), the time allotted for Commission action on a motion for rehearing in this case prior to its being overruled by operation of law, is hereby extended until 90 days from the date the order is served on the parties.

      **SIGNED** this 9th day of December 2014.

           **RAILROAD COMMISSION OF TEXAS**

           **CHAIRMAN CHRISTI CRADDICK**

           **COMMISSIONER DAVID PORTER**

           **COMMISSIONER BARRY T. SMITHERMAN**

**ATTEST:**

**SECRETARY**

Westlake Ethylene Pipeline Corporation-T.R.R.C. No. _____
[Cancels Mustang Pipeline Company – Texas Local Tariff. -3]

WESTLAKE ETHYLENE PIPELINE CORPORATION
Mont Belvieu to Longview Pipeline

LOCAL TARIFF
Applying on

PETROLEUM PRODUCTS
As Defined in This Tariff

TRANSPORTED OR EXCHANGED BY PIPELINE
Between Points Within the State of Texas
Subject to the Regulations
Set Forth Herein

ISSUED: _____                          EFFECTIVE: _____

Filed with the Railroad Commission

DATE: _____

Issued and Compiled By:

WESTLAKE ETHYLENE PIPELINE CORPORATION
2801 Post Oak Boulevard, Suite 600
Houston, Texas 77056

1

WESTLAKE ETHYLENE PIPELINE CORPORATION, hereinafter called "Carrier," will receive Product, as hereinafter defined, for its Mont Belvieu to Longview pipeline, for transportation or exchange under the conditions set forth below in Section III, "Rules and Regulations," at the rates set forth in Section II, "Product Specifications and Local Rates."

## I. DEFINITIONS

a) The term "barrel" as used herein, means forty-two (42) United States gallons at sixty degrees Fahrenheit (60° F).

b) The term "day," as used herein, means a period of twenty-four (24) hours, commencing at 7:00 a.m. on one calendar day (the date of which shall be taken as the date of the day in questions) and extending until 7:00 a.m. on the following calendar day.

c) The term "Delivery Point," as used herein, means one of the locations defined in Section II, "Product Specifications and Local Rates," for delivery of Product by Carrier to Shipper.

d) The term "gallon," as used herein, shall mean one (1) United States gallon at sixty degrees Fahrenheit (60° F).

e) The term "Origin Point," as used herein, means one of the locations defined in Section II, "Product Specifications and Local Rates," for introducing Product into the respective pipelines.

f) The term "pound," as used herein, means one (1) pound avoirdupois.

g) The term "Product" as used herein, means the liquid petroleum gas products defined in Section II, "Product Specifications and Local Rates," for the respective pipelines.

h) The term "Shipper," as used herein, means the party or parties who contract with Carrier for the transportation or exchange of Product under the terms of this tariff.

As the context may require, the plural form shall be construed to include the singular, and the singular form shall be construed to include the plural.

## II. PRODUCT SPECIFICATIONS AND LOCAL RATES

a) The rates published in this tariff are for transportation or exchange within the State of Texas through Carrier's Mont Belvieu to Longview pipeline and such transportation or exchange is subject to the rules and regulations contained herein and to all applicable rules, regulations, and orders of the Railroad Commission of Texas and other governmental authorities having jurisdiction.

b) Rates apply to specified petroleum products from the established receiving facilities to the established delivery facilities at points named below.

2

Product: Liquefied petroleum gas meeting the following specifications:

| Components | Specifications | Test Method |
|---|---|---|
| Ethylene (Minimum) | 99.90 mol % | ASTM D 2505 |
| Methane | 350 ppmV | ASTM D 2505 |
| Ethane | 465 ppmV | ASTM D 2505 |
| Acetylene | 1.5 ppmV | ASTM D 2505 |
| Propylene & Heavier | 5 ppmV | ASTM D 2505 |
| Carbon Dioxide | 1 ppmV | ASTM D 2505 |
| Carbon Monoxide | 0.15 ppmV | ASTM D 2504 |
| Water | 2 ppm wt | Panametrics |
| Total Sulfur | 1 ppm wt | ASTM D 3246 |
| Oxygen | 4 ppm wt | ASTM D 2504 |
| Hydrogen | 5 ppmV | ASTM D 2504 |
| Ammonia | 1 ppm wt | ASTM D 5234 |
| Methanol | 1 ppm wt | ASTM D 5234 |

Origin/Delivery Point: Carrier's stations located at or adjacent to the terminals of Equistar Chemicals, Williams Storage, and Flint Hills Resources at Mont Belvieu, Texas, when such points of origin are practicable and consistent with the operation of the pipeline, or such other points as the Carrier may designate and publish from time to time.

Origin/Delivery Point: Carrier's station in Gregg County, Texas, located adjacent to the Texas Operations Eastman Chemical Company facility (in Gregg and Harrison Counties, Texas), when such point of delivery is practicable and consistent with the operation of the pipeline, or such other points as the Carrier may designate and publish from time to time.

Rate:
a. $1.90 per 100 pounds for the first 320,000 pounds transported or exchanged in a single day.

b. $0.70 per 100 pounds for each additional amount transported or exchanged in a sing day.

## III. RULES AND REGULATIONS

1. Testing

Product accepted for transportation or exchange under this tariff shall be delivered to Origin Point by Shipper and shall conform to the applicable Product definition. Shipper may be required to furnish Carrier with a certificate setting forth in detail specifications of each shipment offered for transportation or exchange hereunder, and Shipper shall be liable for any contamination or damage to other Product in Carrier's custody or to Carrier's pipeline or other facilities caused by failure of the shipment tendered to meet the specifications stated in Shipper's certificate.

3

Carrier may, but shall not be required to, sample and/or test any shipment prior to acceptance or during receipt of shipment and, in the event of variance between said certificate and Carrier's test, Carrier's test shall prevail. In the event that any test indicates that the Product offered for transportation or exchange does not conform to applicable Product definition, Shipper agrees, either voluntarily or upon notification by Carrier, to case delivery of off-specification Product to Carrier until such time as it is determined by additional testing that the Product conforms to the applicable Product definition.

2. Measurement

Carrier will utilize meters located at the Origin Point and Delivery Point whereby the quantities of Product tendered by Shipper to Carrier will be measured and the temperature and pressure of such Product be recorded. The volume of Product delivered each day will be determined by reference to daily readings of such meters. Correction factors and calculations from such meter readings for the purpose of determining the daily quantities of Product delivered will conform with the standard procedures utilized by the owner or operator of such meters.

If for any reason the custody transfer meters are out of service so that the quantity of material delivered through such meters cannot be ascertained, the quantity of material delivered during the period the meters are out of service will be estimated by Carrier based upon the best available data, using in order of preference the following methods:

a. By using the registration of any check measuring equipment of Carrier.
b. By using any measurement equipment which Carrier may have in the flowing stream.
c. By any independent third party chosen by Carrier and generally recognized in the industry as competent to perform such estimate.

Carrier shall have the right to go upon the premises where Shipper's Product is metered and tested for quality assurance before delivery to Carrier's pipeline. Carrier shall have access to any and all such metering and testing equipment for the purpose of making any examination, inspection, or test.

Product will be received and delivered on the basis of volume corrections from observed temperatures to temperatures on the basis of sixty degrees Fahrenheit (60° F) using gravities, correction factors, and volume corrections for compressibility appearing in American Petroleum Institute (API) Manual of Petroleum Measurement Standards (latest edition) or other method agreed to by Shipper and Carrier.

4

Physical and legal transfer of custody of the Product from Shipper to Carrier shall be at the point immediately downstream of applicable measuring and metering facilities at the Origin Point. Physical and legal transfer of custody of the Product from Carrier to Shipper shall be at the point immediately downstream of applicable measuring and metering facilities at the Delivery Point.

3.   Facilities at Origin and Delivery Point

Carrier will provide such facilities at Origin Point and at Delivery Point as it deems necessary for the operation of the pipeline. Carrier will not provide tankage or storage facilities or receiving, loading, or unloading facilities at either the Origin Point or the Delivery Point. Shipments will be accepted for transportation or exchange hereunder only:

a.   When Shipper has provided facilities satisfactory to Carrier capable of delivering shipments at Origin Point at pressures and at pumping rates required by Carrier; and

b.   When Shipper is capable of receiving shipments at Delivery Point by pipeline at pressures and at pumping rates required by Carrier.

This paragraph means that a shipper is responsible for providing or arranging sufficient compression or other services to effectuate the entry of the Product into the pipeline at an Origin Point and the delivery of the Product out of the Pipeline at the Delivery Point.

Carrier is not obligated to transport or exchange any volumes of ethylene unless Shipper delivers those volumes into the common stream out of which deliveries are made to Pipeline's customers.

Separate pipage contracts in accordance with this tariff and these Rules and Regulations covering further details may be required of the proposed Shipper before any duty of transportation or exchange shall arise.

4.   Minimum and Maximum Shipments

The quantity of a Product which Carrier may be obligated to accept at Origin Point shall be no less than 320,000 pounds delivered over a single day. Carrier may, at its sole election, accept a lesser quantity tender upon Shipper's agreement to pay Carrier, for said day, charges equal to those which would have resulted from transportation or exchange of said 320,000 pounds at the local rates provided herein.

5

5.    Tender Deductions

A tender deduction of 1/2 percent by weight may be made on the quantity of Product received at Origin Point. Except as otherwise provided in this tariff (including, but not limited to, adjustments as provided in Paragraph 2, "Measurement"), Carrier will be accountable for delivery at Delivery Point of the quantity remaining after deduction of said tender deduction.

6.    Payment of Transport or Exchange

The charges for transportation or exchange of Product accepted for shipment shall be based on the applicable rate set forth above in Section II before tender deduction, if any, is made. Shipments accepted for transportation or exchange shall be subject to a lien in favor of Carrier for all lawful charges hereunder.

Transportation or exchange charges incurred during any month will be invoiced about the 10th day of the succeeding month and shall be paid within 10 days of receipt of invoice. Carrier may require that charges:

a.    be prepaid at time of acceptance, or
b.    on demand be paid before release of Product from custody of Carrier. Carrier may charge Shipper interest of 1½ percent per month (18 percent per annum) for overdue transportation or exchange charges.

Carrier shall have a lien on all Product until the charges are paid. If the charges shall remain unpaid for more than five (5) days after notice of readiness to deliver, the Carrier may sell the Product at public auction at the general office of the Carrier on any day not a legal holiday. The date for the dale shall be not less than 48 hours after publication of notice in a daily newspaper of general circulation published in the city where the general office of the Carrier is located. The notice shall give the time and place of the sale and the quantity of the Product to be sold. At said sale, Carrier shall have the right to bid, and if the highest bidder, to become the purchaser. From the proceeds of such sale, Carrier will pay itself the transportation or exchange and all other lawful charges, including expenses incident to said sale, and the balance remaining, if any, shall be held for whomsoever may be lawfully entitled thereto. The remedies set forth in this tariff are in addition to, and not in limitation of, any statutory or common law remedy available to Carrier pursuant to the laws of the State of Texas. Shipper agrees that the venue of any suit regarding shipments shall be Gregg County, Texas.

7.   Clear Title

Shipper shall notify Carrier when any Product tendered for transportation or exchange is involved in litigation or is the subject of disputed ownership or is encumbered by lien or charge of any kind.  Carrier shall have the right to reject any shipment, when offered for transportation or exchange, which may be involved in litigation or the title of which may be in dispute or which may be encumbered by lien or charge of any kind, and Carrier may require of the Shipper satisfactory evidence of his perfect and unencumbered title or satisfactory indemnity bond to protect Carrier against any and all loss.

8.   Tenders

All Shippers desiring to tender Product for transportation or exchange on Carrier's facilities shall furnish a written nomination to Carrier by the fifteenth (15th) day (excluding Carrier holidays) of the month prior to the month Shipper desires transportation or exchange.  Nominations shall specify the quantity of Product to be transported or exchanged, the Origin Point, the Delivery Point, and any other information required by Carrier.  If Shipper does not furnish such written nomination, Carrier shall be under no obligation to accept such Product for transportation or exchange.

Nominations shall be transmitted to Carrier to the attention of Westlake Ethylene Pipeline Corporation Scheduler as follows:

a.   by facsimile to the Westlake Ethylene Manager at (713) 960-8761, or
b.   by electronic mail, as arranged between Carrier and Shipper.

Any nominations accepted by Carrier will be delivered on a ratable basis.

9.   Identity of Shipments

In view of the impracticability of maintaining the identity of shipments, shipments will not be segregated, but will be commingled and deliveries will be made at Delivery Point from Carrier's common Product streams.

10.  Disposition of Shipments

In the event that Shipper does not have adequate facilities available to receive or is not capable of receiving any shipment at the Delivery Point in accordance with Carrier's schedules, Carrier may make whatever disposition of such undelivered shipment which is necessary to order to free its pipeline.  Carrier shall not be liable to Shipper because of

7

such disposition, and Shipper shall pay for all costs and fees thereof the same as if Shipper had requested or authorized such disposition.

11. Apportionment of Tenders and Withdrawals

In the event Shipper's tenders at Origin Point or Shipper's withdrawal requirements at the Delivery Point are greater than can be currently handled by Carrier, Carrier may restrict or suspend tenders or withdrawals in order to apportion deliveries among all Shippers on an equitable basis. The Carrier shall be considered as a Shipper of Product produced or purchased by itself and held for shipment through its line and its product shall be entitled to participate in such apportionment.

12. Transit Privileges

Carrier may not be required by Shipper to stop Product in transit for any reason.

13. Liability of Carrier and Indemnity

Carrier shall not be liable for any delay in delivery or for any loss of Product caused by an act of God, public enemy, quarantine, authority of law, order, rule or regulation of federal, state or local government, strikes, riots, fire, explosion, equipment breakage, floods or by act of default of Shipper, or resulting from any other cause outside of the reasonable control of the Carrier, whether similar or dissimilar to the causes herein enumerated. Any such loss shall be apportioned by Carrier to each shipment of Product or portion thereof involved in such loss in the proportion that such shipment or portion thereof bears to the total of all product in the loss, and each Shipper shall be entitled to receive only that portion of its shipment remaining after deducting its proportion as above determined of such loss. Carrier shall prepare and submit a statement to Shippers showing the apportionment of any such loss.

The Carrier operates under this tariff solely as a provider of transportation or exchange services and not as an owner, manufacturer, or seller of Product transported or exchanged hereunder, and the Carrier expressly disclaims any liability for any expressed or implied warranty for Product transported or exchanged hereunder including any warranties of merchantability or fitness for intended use.

FOR ALL SERVICES PROVIDED FOR AND RECEIVED UNDER THIS TARIFF, SHIPPER SHALL INDEMNIFY AND DEFEND CARRIER FROM ANY CLAIMS, LIABILITIES, OR LOSSES (INCLUDING COSTS OF DEFENSE AND REASONABLE ATTORNEY'S FEES), INCLUDING CLAIMS FOR PERSONAL

8

INJURY, DEATH OR PROPERTY DAMAGE INVOLVING THE CARRIER, SHIPPER, CONSIGNEES, OR THIRD PARTIES BASED ON OR ARISING OUT OF CARRIER'S PERFORMANCE OF SUCH SERVICES. THIS INDEMNIFICATION SHALL INCLUDE CLAIMS OF ANY NATURE, LEGAL, CONTRACTUAL OR EQUITABLE, WHETHER BASED ON STRICT LIABILITY, NEGLIGENCE, BREACH OF WARRANTY, OR ANY OTHER CAUSES OF ACTION. THE INDEMNITY PROVIDED IN THIS TARIFF IS INTENDED TO BE APPLICABLE TO THE FULL EXTENT ALLOWED BY LAW AND IS LIMITED ONLY IN ACCORDANCE WITH STATUTORY OR COMMON LAW. TO THE EXTENT NOT PROHIBITED BY LAW, THIS INDEMNITY APPLIES TO ANY ACT OR OMISSION, WHETHER NEGLIGENT OR NOT, ARISING OUT OF OR RELATING TO THE PERFORMANCE OF SERVICE BY CARRIER PURSUANT TO THIS TARIFF, INCLUDING THE SOLE OR CONCURRENT NEGLIGENCE OR GROSS NEGLIGENCE OF CARRIER.

14. Claims

Notice of claims for loss, damage, or delay in connection with the shipment of Product must be made in writing to Carrier within 45 days after the damage, loss, or delay occurred. If the claim is for failure to make delivery, the claim must be made within 15 days after a reasonable time for delivery has elapsed.

15. Additives, Dyes, and Odorization

a. Carrier may inject corrosion inhibitor compound in the Product to be transported or exchanged, and Shipper will accept delivery of Product at Delivery Point containing portions of corrosion inhibitor.

b. Carrier will assume no liability for discoloration, contamination, or deterioration of Product transported or exchanged, unless negligent conduct by Carrier is determined to be the sole, proximate cause of the cost, expense, damage or liability incurred by Shipper.

c. Except where required by law, Carrier will not inject dyes nor odorize any Product tendered. Should Carrier be required by law to inject dyes or to odorize any Product tendered, Shipper:

(1) Will furnish the dye to be injected and/or the malodorant to be added and

(2) May be required by Carrier to provide and/or install satisfactory equipment to effect such injection and/or odorizing.

9

16. Imbalance Charges

In the event that Shipper fails to deliver to Carrier at the Origin Point the equivalent volumes of Product which Carrier redelivers to Shipper at the Delivery Point during a calendar month, then Shipper will pay Carrier an imbalance charge of one cent (1¢) per pound per day for each day the imbalance continues. If Shipper delivers volumes to Carrier in excess of those volumes which Carrier redelivers to Shipper in any calendar month, then Shipper will pay an imbalance charge of one cent (1¢) per pound per day for each day the imbalance continues. Carrier may waive such imbalance charges if Carrier, in its sole discretion, determines that the imbalance is immaterial. The waiver of such charges for any particular imbalance period is not to be construed as a waiver of such charges for any other imbalance and Carrier maintains the right to collect such charges from Shipper for any imbalance not the subject of a written waiver.

17. Direction of Flow

In the event the pipeline is configured and equipped so that it is physically capable of bi-directional flow, Carrier at its sole discretion will choose the direction of flow between the Origin Point and Delivery Point. Carrier will make a reasonable attempt to accommodate Shippers through the exchange of product at Origin and Delivery Points. Any exchanges will be subject to the same terms and conditions applicable to shipments pursuant to this tariff, including the rate charged for such exchanges. The provisions of this tariff apply to all shipments or exchanges regardless of the direction of flow or whether the product shipped or received is physically moved from one point to another.

END OF DOCUMENT

10

# Ex. B

# KEY RULINGS IN RRC ORDER

**Findings of Fact**

84. The elimination of backhaul and exchanges, pre-existing service offered by the common carriers of this pipeline, provides an unreasonable preference in favor of Westlake Longview.

85. Whether discrimination by a common carrier exists depends on the facts of a particular case. **The discriminatory act found** to have occurred in this docket is the cancellation of pre-existing backhaul and exchange services so that one shipper, Eastman Chemical, is forced to sell or exchange the ethylene it produces to the only other shipper on the pipeline, Westlake Longview, the parent company of the pipeline.

**Conclusions of Law**

12. Tariffs that provide disparate treatment to similarly-situated shippers or provide an unreasonable preference or advantage to an affiliate at the expense of other shippers are discriminatory.

13. **There is no general duty for a common carrier to provide backhaul and exchange services. Neither is there a general duty to maintain services previously offered by a common carrier**. It is discriminatory, however, for a common carrier to cancel previously existing services and cut off access to a market so that all other shippers on the pipeline are forced to sell or exchange their product with a shipper on that same pipeline which is affiliated with the pipeline.

# Ex. C

# EASTMAN'S CASE IS BUILT ON SPECULATION

"The **uncertainty** is already causing Eastman **competitive injury**. If ethylene produced in Longview will not have access to markets in Mont Belvieu, a subsequent owner of Eastman's crackers **might be forced** to sell only to Westlake Longview at whatever price it is willing to pay. And, in a prolonged scenario under the 2013 Tariff, **Eastman could suffer a host of losses**, **including continued uncertainty** in the context of Eastman's announced sale of certain ethylene-producing facilities in Longview. Thus, even if such a showing were required under Texas law, the evidence here sufficiently demonstrated harm."

- Eastman's Brief at 30-31.

"**When** the ethylene consumers in Longview have insufficient demand, the ethylene not being consumed must have a way to leave Longview and go to Mont Belvieu. CR124. Eliminating the ability to move ethylene out of Longview poses serious problems and **could cause** Eastman to shut down its entire production capacity."

- Eastman's Brief at 11.

"Eastman's evidence included testimony from Mark Bogle that, after it published the 2013 Tariff, Westlake showed itself '**ready and willing** to leave Eastman's ethylene stranded in Longview,' CR2494, by refusing a request for exchange service under the ESA."

- Eastman's Brief at 30.

# Ex. D

# EASTMAN WITNESS' TESTIMONY THAT THERE HAS NOT BEEN ANY DISPARATE TREATMENT OF EASTMAN BY WESTLAKE PIPELINE AS TO SERVICE, FLOW OR EXCHANGE

Eastman's lead witness, Vice President Mark Bogle, did not identify any disparate treatment of Eastman by Westlake Pipeline. The following exchange occurred during his cross-examination:

Q.    So Eastman's complaint in this proceeding is solely the changes that Westlake Pipeline made to its tariff and is not based on any actual refusal to provide requested service to Eastman or any other shipper, correct?

A.    That's correct.

Q.    And Eastman does not allege that Westlake Pipeline has exchanged ethylene for someone else but refused to exchange it for Eastman, correct?

A.    That's correct.

Q.    And Eastman does not allege that Westlake Pipeline has agreed to physically flow ethylene from Longview to Mont Belvieu for someone else but refused to do so for Eastman, right?

A.    That's correct.

CR.2464

## EASTMAN'S WITNESS' TESTIMONY THAT THERE HAS BEEN NO STRANDED ETHYLENE

Eastman's lead witness, Vice President Mark Bogle, testified on cross-examination that no Eastman ethylene had been stranded in Longview:

Q.    …during the time that the revised Westlake tariff was in effect from July 2013 until early February 2014, none of Eastman's ethylene was stranded in Longview, correct?

A.    That's correct.

\* \* \*

Q.    And during that same time that the Westlake tariff -- revised Westlake tariff was in effect from July 2013 to February 2014, the revisions to the tariff did not cause Eastman to have to reduce production from its crackers, correct?

A.    That's correct.

\* \* \*

Q.    …you testify, if Eastman cannot move the ethylene it produces at Longview out of its facilities, it cannot operate those facilities or at least has to reduce the operations of those facilities. Did I read that correctly?

A.    Yes.

Q.    Now, at the time you filed your testimony in this proceeding, the hypothetical situation you describe… had never occurred, correct?

A.    That's correct.

\* \* \*

Q.    …You're not aware of a situation following the sale of the pipeline to Westlake Pipeline in which production from the crackers had to be reduced as a result of anything that Westlake Pipeline had done or the result of any changes to its tariff?

A.    Correct.

CR.2467

# Ex. E



**HOWARD**
ENERGY PARTNERS

November 25, 2014

Chairman Christi Craddick
Commissioner David Porter
Commissioner Barry T. Smitherman
Railroad Commission of Texas
1701 North Congress Avenue
Austin, TX 78701

Re:  Gas Utilities Docket No. 10296, Complaint Filed by Eastman Chemical Company against Westlake Pipeline Corporation (Westlake Pipeline) Regarding Westlake Pipeline's T-4 Permit No. 05253

Dear Chairman Craddick and Commissioners Porter and Smitherman:

I am a co-founder and the Chairman and CEO of Howard Energy Partners, and I am submitting this letter to express concern with the proposal for decision (PFD) issued in the above-mentioned case. I have over 20 years of experience in the midstream industry, working for companies such as Enlink Midstream Partners (formerly Crosstex) and, prior to founding Howard Energy Partners in 2011, as President of Midstream at Energy Transfer Partners. Howard Energy Partners owns and operates more than 500 miles of gas and liquids pipelines serving the Eagle Ford, Escondido, Olmos, and Pearsall formations among others, employing more than 120 employees in South Texas. We also operate liquids processing and storage facilities and rely on the continued development of a robust liquids pipeline network in Texas. As such, we have followed this proceeding with interest and have reviewed the submissions and testimony to keep informed of the parties' positions and the issues.

On October 20, 2014, a PFD was issued in the proceeding. Several aspects of the PFD are troubling to us, because it would impose on Westlake Pipeline, a common carrier, duties that exceed those imposed by applicable Texas statutory regulations and case law, and more burdensome than those imposed on interstate common carriers by the federal government.

The PFD attempts to limit itself to the specific facts presented in Eastman's complaint, and Eastman argues strenuously that a decision regarding Westlake will have no precedential effect. However, the reality is that of course a decision imposing unprecedented burdens on common carrier pipelines-that go beyond anything that a common carrier has been ordered to do previously by the Railroad Commission or by federal regulators-will be relied upon by other shippers to seek equally extraordinary relief in similar or different circumstances. We are concerned that the broad principles set forth in the PFD will simply encourage litigation at the Commission. Other recent cases, including the Denbury decision at the Texas Supreme Court, were expressly limited in scope, but have nevertheless spawned a wave of litigation. The Texas pipeline industry needs regulatory stability right now, not new ad hoc standards.

The PFD finds discrimination where the same tariff was applied to different parties in the same way. An essential element of any discrimination analysis has always been that similarly situated shippers are treated differently. The simple fact that equal implementation of the same tariff would affect different shippers differently is not discrimination; rather, it is the real world where often tariff changes by a pipeline impact some shippers favorably and others not. As we understand the facts and testimony presented in this docket, Westlake Pipeline is not proposing to offer any service to its affiliates that it does not also offer to Eastman or to deny any service to Eastman that it does not also deny to its affiliates.

00283

2144

We are also concerned that the PFD focuses on how pipeline service affects shippers rather than whether the service is offered without discrimination. A common carrier cannot control the business decisions of other pipelines or pipeline shippers, and its actions will almost certainly affect different counterparties differently. The PFD goes so far as to suggest that a common carrier discriminates if its actions have a negative effect on the prior investments of a shipper. Common carriers have never been, and should not now be, responsible for protecting the investment decisions of others. They should only be required to treat similarly-situated customers the same.

Perhaps the most troubling aspect of the PFD is that it imposes a heightened and ad hoc regulatory burden where competitive markets have been deemed sufficient in the past. The PFD recognizes that Eastman Chemical and Westlake Longview have a commercial arrangement by which "Eastman secured a guaranteed market for ethylene" as well as the "ability to exchange any excess ethylene that Westlake Longview did not purchase." Given those facts, we see no reason to approve a PFD that will encourage other parties to bring their commercial disputes to the Railroad Commission and will discourage the development of much-needed common carrier pipelines in Texas.

Respectfully submitted,

Mike Howard
Chairman and CEO
Howard Energy Partners

00284  2145

FILED

2014 SEP 12 AM 11: 52

DOCKET SERVICES
RAILROAD COMMISSION
OF TEXAS



**Alan S. Armstrong**
President & CEO
The Williams Companies, Inc.
918-573-2398
Alan.Armstrong@williams.com

One Williams Center
P.O. Box 2400
Tulsa, OK 74102-2400

September 11, 2014

Examiner Gene Montes
Examiner Christina Poole
Railroad Commission of Texas
1701 North Congress Avenue
Austin, Texas 78701

Re:    Gas Utilities Docket No. 10296 – Complaint filed by Eastman Chemical Company against
       Westlake Ethylene Pipeline Corporation regarding Westlake Pipeline's T-4 Permit No.
       05253

Mr. Montes and Ms. Poole:

The Williams Companies, Inc. ("Williams") submits this letter to express concern regarding the relief sought by Eastman Chemical Company ("Eastman") in the above-captioned matter. Williams, through its subsidiary, owns and operates ethylene storage facilities that are capable of receiving ethylene from Westlake Ethylene Pipeline Corporation's ("Westlake") ethylene pipeline. Williams' commodity handling subsidiaries are therefore potential shippers on Westlake's pipeline. Additionally, Williams operates common carrier products pipelines in Texas and frequently examines potential opportunities to develop new common carrier pipelines in Texas.

In the current phase of the proceeding, Eastman seeks to impose duties upon Westlake that exceed the duties imposed on Westlake by applicable statutes, regulations, and case law. Williams is concerned about the precedent that might be set if Eastman is successful. This concern arises from Williams' viewpoint as a shipper on common carrier pipelines, as well as from Williams' viewpoint as a common carrier pipeline operator.

Williams' subsidiary buys, sells, and ships commodities that are transported on common carrier pipelines in Texas. The historical regulatory environment and business practices, in this industry in Texas, have generally operated in a fair and successful manner and are not in need of significant change. If the current proceeding results in precedent inappropriately expanding the types of services, or levels of services that a common carrier can be compelled to offer it is conceivable that shippers would be harmed. For example, a compelled change in service may affect other services already offered by the pipeline and thereby upset the reasonable expectations

512 463 6264

Examiner Gene Montes
Examiner Christina Poole
September 11, 2014
Page 2

of existing shippers. In fact, there is a potential risk that compelling a service may reduce available service already offered by a pipeline.

In regard to the particular service that might be compelled in this proceeding, it is worth noting that an exchange requires ownership of the commodity. The Williams' owned companies that own and operate pipelines do not also buy or sell commodities and would not be able to effectuate an exchange. This is not a wholly unusual business model among pipelines that are in the business to provide transportation for a fee. Therefore, a precedent compelling a pipeline to provide a service of which it is incapable without changing its basic business model, is also a potentially problematic result in this matter.

Additionally, Williams is concerned that a precedent requiring common carriers to provide services that are not already being provided to other similarly situated shippers would result in unsound public policy. When making investment decisions, pipelines are likely to consider the uncertainty of such a precedent as a negative. Therefore, such a precedent would be a disincentive for investment in common carrier pipelines in Texas.

Finally, in Williams view, the position asserted by Eastman, that a common carrier may be compelled to provide services not already on offer, is not supported by statues or case law and would inappropriately expand the obligations of a common carrier pipeline.

For all of these reasons Williams respectfully requests that the Commission refrain from imposing duties on common carrier pipelines that are not otherwise imposed by statute, rule, or case law.

Sincerely,

Alan S. Armstrong

00419    2280



**KINDER MORGAN**
ENERGY PARTNERS, L.P.

September 8, 2014

*Via Certified Mail*
*7009 0080 0001 0280 2812*

Examiner Gene Montes
Examiner Christina Poole
Railroad Commission of Texas
1701 North Congress Avenue
Austin, Texas 78701

       Re:    Gas Utilities Docket No. 10296 — Complaint filed by Eastman Chemical Company against Westlake Ethylene Pipeline Corporation regarding Westlake Pipeline's T-4 Permit No. 05253

Mr. Montes and Ms. Poole:

       Kinder Morgan Energy Partners, L.P. ("KMEP") submits this letter to express concern with the relief sought by Eastman Chemical Company ("Eastman") in the above-captioned matter. KMEP, in combination with its affiliates and subsidiaries, comprises the largest midstream company in North America and owns numerous common carrier pipeline assets in Texas. As such, we have followed this proceeding with interest and have reviewed the submissions and testimony to keep informed of the issues and the parties' positions.

       In the current phase of the proceeding, Eastman seeks to impose duties upon Westlake Ethylene Pipeline Corporation ("Westlake"), which is a common carrier pipeline, that exceed the duties imposed on Westlake by applicable statutes, regulations, and case law. KMEP opposes Eastman's efforts to do so because we believe this does not reflect sound public policy. If Eastman is afforded the relief is seeks, KMEP believes this would not only increase the likelihood of future disputes between shippers and carriers over the scope of services offered on existing common carrier pipelines, but it would also create a disincentive for investment in new common carrier pipelines at a time when such investment is needed to handle the increased amount of hydrocarbons being produced in our state.

       The positions Eastman has taken in this case are troubling to KMEP for several reasons. First, Eastman's argument that a common carrier should be required to provide bi-directional and exchange services, even if the common carrier does not wish to offer such services, is not supported by specific statutory authority. Common carrier pipelines rely on the rules and regulations that have been enacted by the Texas legislature when operating their pipeline systems. A decision in Eastman's favor would inappropriately expand the services a common carrier can be forced to provide by its shippers beyond those that it is required to offer by law, and without an act of the legislature amending such laws.

       Second, we believe that Eastman's position improperly expands the doctrine of discrimination. The industry has always understood discrimination to mean that a common carrier pipeline cannot offer certain services and prices to one shipper while at the same time refusing to offer those same services and prices to another similarly-situated shipper. Eastman

Active 15991641.1

seeks to expand that definition by arguing that even if a common carrier pipeline offers the same services and prices to all similarly-situated shippers, the common carrier pipeline would still be guilty of discrimination if its refuses to offer a certain type of service (to any of its shippers) and as a result, one of its shippers faces different commercial circumstances than another one of its shippers. This position is antithetical to the industry's long-settled understanding of "discrimination" and, if adopted, could require a common carrier pipeline to provide a variety of services it otherwise is not required by statute or rule to offer based on the changing commercial circumstances of its shippers.

Finally, the common carrier pipeline industry depends on certainty of the law and the obligations that inure to each common carrier. Eastman's arguments, if adopted, have the potential to undo much of that certainty. Until now, a common carrier pipeline has had certainty with regard to its obligations – it must provide the services required by law without discrimination. If Eastman's position is adopted, that certainty would disappear because common carrier pipelines would continually be at risk of litigation when shippers decide that they are not content with the requirements of the laws regarding common carriage that exist at any given point in time.

It is our view that a decision in Eastman's favor would not exist in a vacuum. The Supreme Court's recent decision in the *Denbury* case has spawned a wave of litigation against crude oil, NGL, and products pipelines, even though the pipeline at issue in that case was a $CO_2$ pipeline. We believe that a similar result could occur here if Eastman succeeds with its claim. Thus, we respectfully request that the Commission refrain from imposing duties on common carrier pipelines that are not otherwise imposed by statute or rule. To do so would encourage future disputes between shippers and existing common carrier pipelines and discourage new pipeline investments that are critical to our state's continued growth.

Respectfully submitted,

**KINDER MORGAN ENERGY PARTNERS, L.P.**
*By Kinder Morgan G.P., Inc., its General Partner*
*By Kinder Morgan Management, LLC,*
*the Delegate of the General Partner*

By: _Ronald D. McClain_

Name:    Ronald G. McClain

Title:    Vice President

October 19, 2015

Honorable Tim Sulak, Presiding Judge
353rd Judicial District Court
Heman Marion Sweatt Courthouse
1000 Guadalupe, 5th Floor
Austin, TX 78701

     Re: **Amicus Curiae Brief** – Appeal in *Westlake Ethylene Pipeline Corporation v. Railroad
     *Commission of Texas*; Cause No. D-1-GN-15-001009 in the 353rd Judicial District Court of
     Travis County, Texas

To the Honorable Tim Sulak,

EnLink Midstream Operating, LP and Howard Energy Partners (collectively "Amici") file this amicus curiae brief to address serious issues that have arisen for the Texas pipeline industry as a result of the Railroad Commission of Texas' (RRC or Commission) December 9, 2014 order that is the subject of the instant appeal.[1]

Westlake Ethylene Pipeline Corporation's (Westlake Pipeline) brief, filed with the Court on August 14, 2015, explains these serious issues and the legal error in the RRC's order in detail. Here, Amici provide our arguments in support of reversing the RRC's unprecedented interpretation of the longstanding common carrier principle that a common carrier may choose to provide services that it offers so long as it provides those services on a nondiscriminatory basis, and of reversing the RRC's unprecedented and unsupported application of the well-established concept of discrimination regarding pipeline services.

**Facts**

Westlake Chemical Corporation (Westlake Chemical), the parent of Westlake Pipeline, acquired the Westlake Pipeline and associated assets from Eastman Chemical Corporation (Eastman) in 2006. The acquisition did not include any terminals or any of the compression necessary to operate the pipeline. The sale included a 99 year contract between Eastman and Westlake Chemical that provided Eastman the opportunity to exchange ethylene[2] with Westlake Chemical that Westlake Chemical did not otherwise purchase from Eastman. Westlake Pipeline is not a party to the purchase and exchange contract and the contract does not entitle Eastman to transportation services, whether forward haul or backhaul, on Westlake Pipeline.

---

[1] The Commission's order was issued by a 2-1 vote, with Commissioners Craddick and Porter voting for the decision and Commissioner Smitherman voting against. The Commission denied a motion for rehearing also by a vote of 2-1, with the same Commissioners voting against the motion and newly elected Commissioner Sitton voting for the motion to rehear the initial decision.

[2] An exchange is a commodity transaction that does not require pipeline transportation but instead involves the transfer of title of equivalent volumes of a product between two owners of the product at different locations. It is in effect a virtual transfer of title to equivalent volumes of product that does not involve physical movement of the product. Pipeline companies typically do not own any of the product that is shipped through the pipelines.

For years, Westlake Pipeline has been operated almost exclusively to transport ethylene northward from Mont Belvieu to Longview, Texas. Southward transportation (backhaul service) was available only at the discretion of Westlake Pipeline, as provided in the pipeline's 2002 and 2013 tariffs, and was used only sporadically by Eastman with Westlake Pipeline's consent. Westlake Pipeline filed a tariff revision in 2013 removing the backhaul service option and Eastman filed a discrimination complaint with the RRC.

Despite these facts, the RRC ordered Westlake Pipeline to provide backhaul service to Eastman. The RRC also ordered Westlake Pipeline to provide exchange services despite the pipeline not having ownership of any product.

## Effect of the RRC Decision

The effect of the RRC's decision is to dictate business operations for private pipelines, interfere with existing contracts between private parties, and interfere with the ability of common carrier pipelines to choose which services to provide to shippers so long as such services are provided on a nondiscriminatory basis, which is a longstanding fundamental principle of common carrier service.

The RRC's order opens the door for pipelines and shippers with pipeline affiliates to be forced to offer services they would otherwise not choose to offer and, in fact, may not be able to offer. The RRC's order denies a pipeline the discretion to control its direction of flow and operate its pipeline in the manner it deems most beneficial and efficient. Furthermore, the RRC has ordered a pipeline to engage in commodity transactions (exchanges) when it has no contractual obligation to do so. With this decision, the RRC has cleared the way for other Texas shippers to seek RRC orders requiring pipelines or their affiliates to offer new services. This overturns longstanding law and industry practice that a common carrier is free to choose the services it wishes to provide so long as it acts in a nondiscriminatory manner.

## Argument

### 1. There is no legal authority for the RRC to impose bidirectional or exchange services.

"A carrier may use its property in any way it chooses to promote its best interests, provided that such use is not inconsistent with the duty the carrier owes to the public."[3] Other than the erroneous order in this case, we are unaware of any statute, Commission rule or common law that requires a common carrier pipeline to offer bidirectional or exchange service.

On the contrary, the Federal Energy Regulatory Commission (FERC) has held that refusal to offer exchange service does not violate a common carrier's duty.[4] Other pipeline tariffs on file at the Commission, including the tariff of an Eastman affiliate, do not offer any bidirectional or exchange service. Eastman failed to identify in the record a single liquids pipeline tariff that provided for exchange service. By contrast, Westlake Pipeline provided many examples of liquids pipelines that do not offer exchange service.

---

[3] Tammy E. Hinshaw, et al., 11 TEX. JUR. 3D, Carriers § 8 at 39, *citing Lewis v. Weatherford*, 36 TEX. CIV. APP. 48, 81 S.W. 111, 113 (Fort Worth 1904, *writ ref'd*).

[4] *See Williams Refining Pipeline Co.*, 123 FERC ¶ 61271, at 62658 (2008) ("Shipments on the Western pipeline system . . . were in a northerly direction from Midland, Texas to points in northwestern New Mexico . . . [T]he fact that Western is not offering an exchange transportation service does not constitute discrimination under the [Interstate Commerce Act] or a failure of Western to fulfill its common carrier duty of providing service upon reasonable request.")

3358

## 2. The RRC order gives a new interpretation to the concept of "discrimination."

The RRC order turns traditional discrimination analysis on its head by focusing not on whether the carrier has treated all similarly situated shippers the same (the proper standard), but rather on whether the carrier's actions affect shippers differently (which they almost always will). Absent reversal of the RRC, any shipper adversely affected by a tariff change will suddenly be able to argue "discrimination." In fact, in this instance, the result of the RRC order is that Eastman will be treated **better** than other shippers in Longview, and receive an undue preference over other shippers.

## Conclusion

The RRC erred in ruling in favor of Eastman. When agencies reach beyond their statutory authority, they disrupt the market, cause confusion and undermine freedom of contract. Left to stand, the RRC order creates the potential for pipeline carriers to be awash in shipper complaints and RRC orders compelling the carriers to provide services they would otherwise not choose to provide or that they may not have the capability to provide. The harm to RRC-regulated common carriers as a result of this decision cannot be ignored.

For these reasons, Amici urge this Court to reverse the Railroad Commission's December 9, 2014 order.


Respectfully,


ENLINK MIDSTREAM OPERATING, LP  HOWARD MIDSTREAM ENERGY PARTNERS, LLC


S. Mark Curwin        T. Campbell
Director of Regulatory Affairs    Assistant General Counsel
2501 Cedar Springs Road, Suite 100  17806 IH-10 West, Suite 210
Dallas, TX 75230        San Antonio, TX 78257

# SEMINOLE PIPELINE COMPANY

November 25, 2014

Via Hand Delivery

Examiner Gene Montes
Examiner Christina Poole
Railroad Commission of Texas
1701 North Congress Avenue
Austin, Texas 78701

> RE: GUD No. 10296; Complaint Filed By Eastman Chemical Company Against Westlake Ethylene Pipeline Corporation (Westlake Pipeline) Regarding Westlake Pipeline System's T-4 Permit No. 05253

Dear Examiners Montes and Poole:

Seminole Pipeline Company ("Seminole") files this amicus to express its concern that the Proposal for Decision ("PFD") in the case defines discriminatory conduct in a manner that is overly expansive and inconsistent with the long-standing and well-established precedent of this Commission.

While there can be no dispute that the facts of this case are complex, the case revolves around the sale of the pipeline from Eastman to Westlake Pipeline, a sale of certain other Eastman facilities to Westlake Chemical, execution of an Ethylene Sales Agreement ("ESA") between Eastman and Westlake Chemical concerning the sales price of ethylene, and purchase and exchange options, and finally the filing of a new tariff by Westlake Pipeline. Contractual disagreements between the parties have spilled over into a claim of discrimination that may or may not be primarily driven by the economic consequences of those business decisions, but regardless, creates real potential for a Commission decision that has a broad and unintended impact on liquids pipelines operating within the State of Texas.

It is the long-standing practice and precedent of this Commission to afford common carriers the discretion to determine their service offerings and establish the applicable rates for those services. This case marks a stark departure from that precedent in that it effectively dictates the services that a common carrier must offer to a shipper irrespective of the regulatory obligation to provide that service or the ability of the common carrier to actually provide that service. Here, Eastman complains that but for the provision of backhaul and exchange services through Westlake Pipeline, discriminatory treatment harmful to Eastman will occur. Eastman further complains that the rate Westlake Pipeline seeks to charge for the transportation service that it does offer is unreasonable. Importantly, both parties seem to acknowledge that there is no general duty for a common carrier to provide backhaul or exchange services. Yet, the PFD, under the guise of remedying discriminatory conduct, would impose an affirmative obligation on a common carrier to provide such services upon shipper complaint if a prior owner of the pipeline provided the services or the discontinuance of such services adversely impacts the shipper. To our knowledge, the Commission has never before adopted such a discrimination analysis or the resulting conclusions.

Notably, the procedural posture of this case contemplates that the Commission will decide the discrimination issue separate from the rate issue. Seminole, however, suggests that these issues (*e.g.* both the discrimination claim and rate issues) should be decided collectively when all facts have been developed and fully presented to the Commission for decision. To that end, Seminole encourages the Commission to defer its decision on the discrimination issues until the Examiners present their recommendation regarding the reasonableness of the transportation rates at issue. Seminole submits that deferring a decision at this stage of the proceeding will not only allow the Commission to decide this complaint on a comprehensive basis, but it may afford parties the opportunity to resolve their dispute without the need for a Commission order. Alternatively, should the Commission proceed with its deliberations on the discrimination claims, Seminole encourages the Commission to further expressly limit its decision, beyond that suggested by Eastman, to avoid the potential for unintended consequences on the oil and gas industry within the State.

While discrimination is not defined in the Natural Resources Code, the Commission, in other contexts, has long held that mere inequality is not unlawful discrimination.[1] Likewise, the Commission has recognized that the prohibition against unlawful discrimination allows a range of unequal treatment based upon a rule of reasonableness. The different treatment, however, must be founded upon a substantial and reasonable ground of distinction between favored and disfavored classes of people.[2] Thus, under a traditional discrimination analysis, Eastman would bear the burden to establish that the same service was provided to similarly situated shippers at a preferential price in order to prevail on its complaint. Notably, the evidence in this case showed that there was no service offered to another shipper that was not also offered to Eastman and no service that was denied to Eastman, but provided to another shipper. Thus, under the Commission's traditional discrimination analysis, it would appear that no discrimination has occurred.

The PFD, however, ignores this traditional analysis in favor of a troubling "new" discrimination standard that embraces two new concepts. The first, an "access to market" theory, which concludes that a shipper seeking to ship ethylene from Longview to Mont Belvieu is similarly situated to a shipper who wants to ship ethylene from Mont Belvieu to Longview because they both seek access to what is claimed to be the same market. However, the fact that shippers are willing to pay the tariff to move product from one location to the other demonstrates that they are separate markets. And, second, a "diminished value" theory, which effectively precludes common carriers from discontinuing a service if the service termination would reduce the value of an investment the shipper made while the service was offered on the pipeline. Under either theory, a shipper may claim discrimination based on the economic impact that a common carrier's decision has on that particular shipper and thereby, dictate the business of common carriers. Neither the law nor Commission precedent requires this result - a result that is particularly distressing when, as here, it imposes service requirements on a common carrier despite the absence of any regulatory obligation to provide that service and effectively eliminates the ability of a common carrier to exercise operational control over its pipeline simply due to the services offered by the prior owner of those facilities, which here happens to be Eastman.

In short, Seminole is concerned that this "new" discrimination standard intended to fit this "limited" set of facts will embolden shippers to file unfounded complaints with the Commission and in turn hamper the operational decision-making of common carriers. For that reason, Seminole encourages the Commission to first defer its decision in this matter until it can fully and completely evaluate whether the allegations as to discriminatory conduct and rates are meritorious. Regardless of the timing of its decision, if the Commission finds that discriminatory conduct has occurred, Seminole encourages the Commission to include language in its Final Order that specifically limits the decision to the facts of this case and to

---

[1] *See, Ford v. Rio Grande Valley Gas Co.*, 174 S.W.2d 479, 480 (Tex. *1943); Amtel Communications v. Pub. Util. Comm 'n,*687 S.W.2d 95 (Tex. App. -Austin, 1985).

[2] *United Gas Corp. v. Shepard Laundries Co.*, 189 S.W.2d 485 (1945).

2

expressly state that any decision in this case carries no precedential value. Seminole appreciates the opportunity to share its concerns with the Commission and appreciates the Commission's careful consideration of this matter.

Respectfully submitted,

Seminole Pipeline Company LLC
Michael C. Smith
President

3